UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CSX TRANSPORTATION, INC.,       )
                                            )
                Plaintiff,        )
                                            )  CASE NO. 1:04-cv-1741-DFH-WTL
        v.                       )
                                            )
APPALACHIAN RAILCAR SERVICES, INC., )
                                            )
             Defendant.     )

ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the court on the parties' cross-motions for summary judgment. For the reasons discussed in this entry, the court grants the motion of the defendant, Appalachian Railcar Services, Inc. ("ARS") and final judgment will be entered in its favor.

I.    *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only genuine disputes over

material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Id.*

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Conley v. Village of Bedford Park*, 215 F.3d 703, 708 (7th Cir. 2000).  Because "summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe."  *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  The court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Id.*  The fact that both sides have filed cross-motions for summary judgment does not alter the applicable standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact.  *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001).  In this case, the court's analysis shows that ARSI is entitled to summary judgment, so the court presents the facts from the perspective most favorable to CSX.

II.    *Undisputed Facts*

Toward the end of January 2002 plaintiff, CSX Transportation, Inc. ("CSX"), was contacted by Alliance Coal and asked to move eighty coal-hauling rail cars onto a railroad track spur and to park them there.  The spur belonged to Southern Indiana Gas & Electric Company ("SIGECO"), which is now known as Vectren Energy Delivery.  CSX owned the main track line from which the spur split.  The spur was built to allow coal delivery to the SIGECO facility known as the A.B. Brown Power Plant in Posey County, Indiana.  CSX owned a small portion of the track, approximately 165 feet, after the switch from the main line.  SIGECO owned the reminder of the spur from that point to its power plant.  Alliance Coal had recently purchased new replacement rail cars for the eighty cars that CSX was asked to move, and was in the process of selling the older cars to ARS.  Alliance needed a location to store the rail cars until the sale could be completed and the cars could be delivered.  SIGECO, which had a contract with Alliance for delivery of the coal required to fire its power plant, had agreed to allow Alliance to park the cars on its spur temporarily.  The sale of the cars to ARS was not completed until February 28, 2002.

In late January, prior to completion of the sale, CSX moved the rail cars and parked them on the SIGECO spur at a point approximately a half mile from the main line.  There was a 1% grade at the point where the cars were placed. According to CSX, its employees engaged the air brakes on the rail cars and also employed the hand brakes on certain rail cars, using what it refers to as the "10%

-3-

Rule," meaning that hand brakes were set on eight of the eighty cars. Air brakes typically lose pressure and become ineffective after a week or two, hence the need to apply hand brakes if a group of cars is to sit for any extended period of time.

On the morning of April 1, 2002, Posey County law enforcement informed CSX that rail cars had derailed and come to rest near and on its main line. After investigating the derailment, CSX determined that the eighty rail cars, which by then belonged to ARS, had rolled from the spot where they had been parked on the SIGECO spur toward the switch at CSX's main line. It was also determined that, before arriving at the main line, the first car hit a derailing device that was installed on the SIGECO spur. In all, thirteen cars were derailed. Several of them had sufficient momentum to carry forward on to CSX owned track, causing damage to the track and leaving the cars too mangled to be repaired. An investigation by CSX indicated that only two of the cars had hand brakes set at the time of the derailment, leading CSX to conclude that an unknown person had released the handbrakes on several of the cars until the group of cars had insufficient braking power in place to keep them from rolling downhill. No specialized training is required to release a hand brake.

On the date of the accident, Jim Briski, the CSX area general foreman, went to the scene immediately after learning of the derailment. Briski prepared an electronic report of the incident stating that the cars had derailed at Milepost 0331.6, the closest milepost on the CSX main track. In actuality, it is now

undisputed that the first car of the group derailed at the derailing device installed at the beginning (or end if traveling from the power plant) of the SIGECO spur.[1]

The electronic report submitted by Briski triggered action by the AAR Services department of CSX, which is responsible for the disposition of rail cars after they have been damaged or destroyed in derailments, as well as for payments to car owners if CSX bears responsibility.  Based on Briski's report, CSX computers generated a letter for each of the thirteen derailed cars.  CSX sent those letters to Alliance Coal, the last known owner of the cars.  Alliance forwarded the letters on to ARS.  Each form letter notified the car owner that the rail car had been derailed on CSX track and had been destroyed.  It also contained a request for a depreciated value statement ("DV Statement") for purposes of

---

[1]ARSI argues that CSX has provided conflicting responses during discovery with respect to how much of the spur it owned.  In interrogatory responses and deposition testimony CSX initially stated that SIGECO owned the spur tracks from its power plant to the point on the tracks where the derailing device was installed to keep any cars from rolling out on the main line, and that CSX owned the short portion between the derailing device and the main line.  However, after documentation with specific legal and engineering descriptions was produced and taken into account, CSX more specifically contended that there is a 35 to 40 foot section of spur track on the main line side of the derailing device that it owns.  There may be some difference between the general statements of track ownership in deposition testimony and interrogatory responses when compared to the actual legal description and measurements contained in documentation provided by CSX and therefore potentially, as ARSI maintains, a difference with respect to who owned the tracks where each car derailed.  Nevertheless, there is nothing in the record to establish the precise location where each car left the track.  As shown below, the court does not need to make such a determination in order to reach its decision, so the difference between CSX's more general statements and the actual legal description is immaterial.

calculating the value of each destroyed car under Rule 107 of the applicable railroad association rules.

Pursuant to rules promulgated by the American Association of Railroads ("AAR"), to which both ARS and CSX subscribe and have agreed to be bound, a "damaging carrier" is responsible for derailment clean up and damages to another subscriber's equipment.  *AAR Field Manual of the Interchange Rules*, Rule 107 (2003).  Apparently, because CSX would normally be the "damaging carrier" with respect to rail cars it delivers on its own tracks, its computers generate a form loss letter when the location of a derailment is reported as being on the CSX line.  The rules also provide:  "Responsibility for any damage or loss to a car on non-subscriber track, shall be assumed by the subscriber delivering the car upon such track," except that the delivering subscriber is relieved of such liability and the owner assumes responsibility for damages occurring due to a condition "beyond the control of the delivering subscriber."  *AAR Field Manual of the Interchange Rules*, Rule 99 (2003).[2]  SIGECO is a non-subscriber.  The derailing

---

[2]The relevant portions of AAR Rule 99 provide:

(1)  Responsibility for any damage or loss to a car on non-subscriber track shall be assumed by the subscriber delivering the car upon such track.

(2)  Delivering subscriber will be relieved and owner will assume responsibility for loss or damage due to condition beyond the control of the delivering company, such as fire, explosion, or flood, if the car was forwarded to a non-subscriber facility belonging or leased by the car owner; or where such cars are directed by owner or lessee to a repair facility, storage track or car manufacturing facility.

device is installed on its track to prevent runaway cars from rolling out onto the CSX main line.

After receiving the form letters forwarded by Alliance, ARS followed AAR guidelines and determined that the depreciated value of each destroyed rail car was $28,715.85. It then forwarded DV Statements for each car to CSX. Upon receipt and review of the DV Statements, CSX issued an "authority to bill" letter to ARS for each of the cars. This letter essentially authorized ARS to prepare and submit an invoice for $373,306.05, which was the total of the depreciated value of all thirteen cars. Shortly thereafter, CSX determined that one of the thirteen cars was only damaged and could be repaired. CSX requested that ARS submit a revised invoice in the amount of $344,590.20, which reflected the value of the remaining twelve cars. ARS provided the revision. In July 2002, CSX paid ARS $344,590.20 for the twelve destroyed cars and $9,810.60 for the damaged car. CSX took possession of the twelve destroyed cars and sold them as scrap for $1,000.00 per car.

After making the payments to ARS, someone at CSX came to the realization that the exception in AAR Rule 99 might apply because the rail cars had derailed on SIGECO track. On October 22, 2004, more than two years after making payment to ARS, CSX filed suit seeking restitution of the money it paid, claiming the funds were paid under a mistake of fact. According to CSX, since it did not own the track where the cars derailed and the derailment was the result of

circumstances outside its control, namely vandalism, ARS has been unjustly enriched by CSX's payment.

III.    *Discussion*

CSX maintains that even though its own employee made the mistake of submitting a report listing a CSX mile marker as the location of the derailment, ARS was not entitled to the money it received.  CSX argues that AAR Rule 99 applied to this situation, where a derailment occurred on SIGECO track.  It then argues that as a matter of law, the exception to a delivering carrier's liability for damage under that rule applies because the CSX investigation indicated that eight hand brakes were applied and that an unknown individual was responsible for releasing some of those brakes.  The vandalism of releasing handbrakes is, according to CSX, a "condition beyond the control of the delivering company" as set forth in the Rule.  CSX contends that it owed no duty to ARS, or the previous car owner, Alliance Coal, once it parked the cars on the SIGECO spur.

ARS's arguments in opposition to the CSX motion and in favor of its own summary judgment request are more numerous and varied.  First it argues that the exception within AAR Rule 99 does not apply to the SIGECO track because it is not a "storage track."  ARS also argues that even if the exception could apply, there is at least a question of fact as to whether or not CSX's own negligence caused the loss.  Further, the payment by CSX was part of an express settlement contract, according to ARS, and therefore unjust enrichment does not apply.  Nor

does ARS accept that the payment was made under a mistake of fact. It maintains that no new relevant facts have been discovered since Briski's investigation; rather, the payment was made because of a mistake of law made by CSX in applying the rules and seeking to limit its liability. Under such circumstances, ARS argues that the common law voluntary payment doctrine prohibits recovery. Finally, ARS asserts that its counterclaims of negligence and strict liability remain viable.

This court has already ruled that Indiana law applies in this case. Docket No. 34 (April 27, 2005) (dismissing CSX claim for negligent misrepresentation). As a federal trial court with jurisdiction over a diversity action this court must now apply state law as it believes the highest court of Indiana would apply it if presented with the same issues. *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 796 (7th Cir. 2004).

While a number of ARS's arguments have some immediate facial appeal, one is so substantively rooted in traditional principles of finality that it begs to be analyzed first. After reviewing the Indiana Supreme Court's decision in *Time Warner Entertainment Co. v. Whitman*, 802 N.E.2d 886 (Ind. 2004), and the current draft of the Restatement (Third) of Restitution & Unjust Enrichment § 6 (T.D. No.1, 2001), which the Indiana court cited favorably, this court concludes that under Indiana law, ARS is entitled to summary judgment based upon the voluntary payment doctrine.

In *Time Warner*, cable television subscribers brought an action against their cable provider seeking a refund of a portion of the late fees they had paid. Plaintiffs contended that the monthly late fee of $4.40 or $4.60 per month exceeded the actual damages incurred by the provider as a result of late payments.  The Court of Appeals determined that the customers' claims for money damages were barred by the voluntary payment doctrine.   *Time Warner Entertainment Co. v. Whitman*, 741 N.E.2d 1265, 1275 (Ind. App. 2001).   The Indiana Supreme Court examined the history and application of the voluntary payment rule in Indiana before adopting a version of the doctrine expressed in a new Restatement draft and holding that the doctrine did not apply to the circumstances of the case before it.  *Time Warner Entertainment Co. v. Whitman,* 802 N.E.2d at 893.

In reaching its decision, the Indiana Supreme Court started with the hornbook proposition that, as a general rule, money voluntarily paid with knowledge of all the facts, and without any fraud on the part of the party receiving payment, may not be recovered back even if the money was not legally due.  *Id.* at 889.  Under the old rule, ignorance of the law presents no excuse if the payor has knowledge of the relevant facts.  *Id.*  However, money paid under a mistake of fact and which was not legally due may be recovered back, notwithstanding the payor's failure to employ means that would have disclosed the mistake.  *Id.* at 890.  After tracing the application of those principles in the nineteenth century, see *Chicago, St. L. & P.R. Co. v. Wolcott*, 141 Ind. 267, 39 N.E. 451 (1895);

*Lafayette & I.R. Co. v. Pattison,* 41 Ind. 312 (1872); *Bond v. Coats,* 16 Ind. 202 (1861); *Downs v. Donnelly*, 5 Ind. 496 (1854), and acknowledging that the majority of jurisdictions would apply the doctrine to bar the claims of the cable subscribers, the Indiana Supreme Court chose to adopt a more modern viewpoint that draws no distinction between mistakes of fact and mistakes of law. *Time Warner Entertainment Co. v. Whitman,* 802 N.E.2d at 891. The court opined that a more modern interpretation of the doctrine would better fit the realities of today's business world. It also looked to past precedent, suggesting that because the cable customers were in danger of having their cable service cut off, they were more like the successful plaintiffs in the *Wolcott* and *Pattison* cases, who were forced to pay certain charges to shippers to assure receipt of their property. *Id.*

Restatement (Third) of Restitution & Unjust Enrichment § 6 (T.D. No.1, 2001) provides as follows:

> Part II. Liability in Restitution
> Chapter 2. Transfers Subject to Avoidance
> Topic 1. Benefits Conferred By Mistake
> Tentative Draft No. 1:
>
> (1) Payment of money to one who is not the intended recipient, or payment when no payment is intended, gives the payor a claim in restitution against the recipient.
> (2) Payment of money resulting from a mistake by the payor as to the existence or extent of the payor's obligation to an intended recipient gives the payor a claim in restitution against the recipient to the extent the payment was not due.

The Indiana Supreme Court cited this Restatement section favorably and quoted at length from Comment *e* to the section, which addresses when a payment is

truly voluntary.  The court concluded:  "We think it clear that at minimum there is a genuine issue of material fact as to whether Customers voluntarily paid the late fees in the face of a recognized uncertainty as to the existence or extent of an obligation to Time Warner."  *Time Warner Entertainment Co. v. Whitman,* 802 N.E.2d at 892.

Without more, the conclusion of the Indiana Supreme Court, that a question of material fact remained in the *Time Warner* matter, might suggest that the voluntary payment doctrine should apply to CSX's payment to ARS.  However, a closer look at the facts here, along with a return to Comment *e* to § 6 of the Restatement draft, convinces this court that the Indiana Supreme Court would apply the voluntary payment doctrine to bar recovery here.  In the paragraph that follows the one quoted by the Indiana Supreme Court in *Time Warner,* Comment *e* states:

> Because a payor in a business setting will not gratuitously assume the risk of a recognized uncertainty as to either the fact or extent of its liability, a "voluntary" overpayment within the meaning of the voluntary-payment rule will normally occur in the context of a payment made to settle a claim. Where the terms of settlement involve an explicit compromise of an uncertain liability, the contractual mechanism by which a risk of uncertainty is allocated to the payor is relatively easy to see.  But there may be settlement even in the absence of compromise.  If a disputed claim is paid in full, notwithstanding a recognized uncertainty as to the existence or extent of the payor's liability, the payor has typically made a conscious decision that the anticipated cost of resisting the claim exceeds the amount of the demand.  Payment under these circumstances is "voluntary" to the extent that the settlement is voluntary.

Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. *e* (T.D. No.1, 2001).   The undisputed facts show here that the payment made by CSX was explicitly for the purpose of settling any liability it had for damage to the cars. CSX invited ARS to provide evidence of the depreciated value of the derailed cars. ARS did so.   CSX based its settlement offer on the values provided.   The fact that the amount of the liability was to some degree uncertain and subject to negotiation is evidenced by the undisputed fact that CSX secured an opinion to the effect that one of the rail cars could be repaired, and it reduced its offer accordingly.

CSX negotiated a settlement of what it believed could be its liability under AAR rules and benefitted from the promptness and finality of that resolution.   If CSX had not altered its determination on liability and if ARS had later sought additional compensation for the repaired car as if it had been a total loss, CSX certainly would have been entitled to refuse further payment based on the defense of accord and satisfaction and the finality of that settlement.   Further, ARS certainly would have had a right to investigate the derailment and to make a determination on its own whether CSX was liable under the AAR Rules or otherwise.   But under that scenario, ARS would have been prejudiced by the fact that such an investigation can no longer occur.   The applicable two year statute of limitation for claims ARS might have had against SIGECO expired before CSX even filed its complaint in this case.   See Ind. Code § 34-11-2-4 (statute of

limitations for injury to personal property).  ARS accepted the payment from CSX as a final resolution of the issue of liability for its loss.

Unlike the plaintiffs in *Time Warner*, CSX was not obliged to make the payment to ARS to retain a service or to assure itself of any future benefit. Further, the Indiana Supreme Court all but adopted the current draft of Section 6 of the Restatement (Third) of Restitution & Unjust Enrichment.  Application of the law on mistaken and voluntary payments as set forth and interpreted in the Restatement draft results in a determination that the voluntary payment doctrine applies to bar CSX from recovering its payment.  This court predicts that the Indiana Supreme Court would apply the voluntary doctrine payment to bar CSX's claims against ARS.

IV.    *Conclusion*

Because the court finds that the voluntary payment doctrine applies to bar the claim of CSX, there is no need to assess the merit of the additional arguments raised by ARS in opposition to the CSX Motion for Summary Judgment (Docket No. 53), which is hereby DENIED.  ARS's Motion for Partial Summary Judgment[3]

---

[3]ARS titled its motion as one for "partial" summary judgment, apparently because this court previously dismissed the negligent misrepresentation claim that had been pled as an alternative theory  to the unjust enrichment claim.  In any event, granting the motion provides complete relief and entitles ARS to a final judgment on the entirety of the CSX Complaint.

(Docket No. 55) is GRANTED.  A separate judgment will issue in favor of ARS and against CSX, with costs.


So ordered.


Date: August 7, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Jeffrey D. Cohen
KEENAN COHEN & HOWARD PC
jcohen@freightlaw.net

Shannon McClellan Cohen
SCOPELITIS GARVIN LIGHT & HANSON
scohen@scopelitis.com

Frank J. Deveau
SOMMER BARNARD ATTORNEYS, PC
fdeveau@sommerbarnard.com

Charles L. Howard
KEENAN COHEN & HOWARD PC
choward@freightlaw.net

Paul D. Keenan
KEENAN COHEN & HOWARD PC
pkeenan@freightlaw.net

Peter Jon Prettyman
SOMMER BARNARD ATTORNEYS, PC
pprettyman@sommerbarnard.com

Brad R. Sugarman
SOMMER BARNARD ATTORNEYS, PC
bsugarman@sommerbarnard.com